United States District Court
Middle District of Florida
Fort Myers Division

JAMES STEVEN RAWLS, JR.,

     *Plaintiff,*

v.                               **NO. 2:17-cv-523-FTM-99PDB**

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

---

## Report & Recommendation

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying James Rawls's claims for benefits. Doc. 1. An Administrative Law Judge ("ALJ") issued a partially favorable decision, finding Rawls disabled as of August 19, 2013, but not before. Tr. 19–31.

Rawls challenges the unfavorable part of the decision. Doc. 18. He argues (1) substantial evidence does not support the ALJ's finding his disability began on August 19, 2013, Doc. 18 at 7–11, and (2) the ALJ erred in rejecting opinions of Suniti Kukreja-Barua, Ph.D., a medical expert who, based on her review of the written record, answered interrogatories propounded by the ALJ and testified at an administrative hearing, Doc. 18 at 11–14. The Commissioner opposes relief. Doc. 19.

## I.    Administrative Process

The Social Security Administration ("SSA") uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471–72 (1986). A state agency acting under the Commissioner's authority makes an initial determination.

20 C.F.R. §§ 404.900−404.906 (2015).[1] If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918 (2015). If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an ALJ. 20 C.F.R. §§ 404.929−404.943 (2015). If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982 (2015). If the Appeals Council denies review, the claimant may file an action in federal district court seeking review of the ALJ's decision. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 (2015).

## II.   Framework

To obtain benefits, a claimant must demonstrate he is disabled. 20 C.F.R. § 404.1512(a) (2015). A claimant is disabled if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

To decide whether a person is disabled, the SSA uses a five-step sequential process, asking whether (1) he is engaged in "substantial gainful activity,"[2] (2) he has

---

[1]The parties use the regulations in effect when the ALJ rendered his decision, September 19, 2016. *See generally* Docs. 18, 19. The SSA recently amended the main regulation at issue—Listing 12.05—specifying the amendment would become effective on January 17, 2017, and further specifying the SSA expects federal courts to review decisions using the regulations in effect at the time of the final administrative decisions. 81 Fed. Reg. 66138–66167 (Sept. 26, 2016). With no contention or apparent reason the Court should do otherwise, this report and recommendation uses the regulations in effect when the ALJ rendered his decision, September 19, 2016.

[2]"Substantial gainful activity" is "work activity that is both substantial and gainful." 20 C.F.R. § 404.1572 (2016). "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* "Gainful work activity" is work done "for pay or profit." *Id.* The SSA generally does not "consider activities like taking care of [oneself], household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." *Id.*

a "severe" impairment or combination of impairments,[3] (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1 (2015), (4) he can perform any of his "past relevant work"[4] given his "residual functional capacity" ("RFC"),[5] and (5) there are a significant number of jobs in the national economy he can perform given his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4) (2012).

The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). If the SSA finds disability or no disability at a step, it will "not go on to the next step." 20 C.F.R. § 404.1520(a)(4) (2012).

## III. Administrative Record

### A. Overview

Rawls was born in November 1976. Tr. 179, 432. He completed high school and has worked as a grocery bagger, janitor, dishwasher, pool attendant, and cook. Tr. 55–57, 61, 77–80, 343.

On August 19, 2013, Rawls applied for child's insurance benefits,[6] disability insurance benefits, and supplemental security income, alleging he had become disabled on October 30, 1998, due to a learning disability. Tr. 319, 325.

---

[3]A "severe" impairment is an impairment that "significantly limits … physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2012).

[4]"Past relevant work" is "work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. § 404.1560 (2012).

[5]A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1) (2012).

[6]Child's insurance benefits are for those whose parents have worked and earned enough social-security credits and are entitled to benefits or deceased. 20 C.F.R. § 404.350 (2015). When a parent dies, "benefits help to stabilize the family's financial future." Benefits.gov, www.benefits.gov/benefit/4380 (last accessed Feb. 4, 2019).

To be eligible for child's insurance benefits, Rawls had to have become disabled before November 30, 1998 (before age 22). Tr. 20 (citing 42 U.S.C. § 405). To be eligible for disability insurance benefits, he had to have become disabled by September 30, 2002 (the date last insured). Tr. 20 (citing 42 U.S.C. §§ 416 and 423). He could not obtain supplemental security income before August 19, 2013 (the application date). 20 C.F.R. § 416.335 (1996).[7]

After failing at the initial and reconsideration levels, Tr. 109–78, Rawls requested a hearing before an ALJ, Tr. 220–21. The ALJ conducted two hearings, one on April 15, 2016, and one on August 25, 2016, between which he obtained opinions through written interrogatories from Dr. Kukreja-Barua, a non-examining, impartial medical expert. Tr. 50–71, 72–101, 396–404.

In a partially favorable decision dated September 19, 2016, the ALJ found Rawls disabled as of August 19, 2013, resulting in entitlement to supplemental security income, but not disabled before August 19, 2013, resulting in no entitlement to child's insurance benefits or disability insurance benefits.[8] Tr. 19–31.

Rawls sought review of the unfavorable part of the ALJ's decision. Tr. 313–17. The Appeals Council denied review. Tr. 1–5. This case followed. Doc. 1.

## B.   *Evidence*

### 1.   *Early Evidence (School Records)*

In March 1992 (age 15), Rawls underwent a psychoeducational re-evaluation by a school psychologist "as required [every three years] by federal and state special

---

[7]Rawls's application for supplemental security income is not in the administrative record, presumably because Rawls received a favorable decision on it. Tr. 28–31.

[8]Rawls raises no argument about any physical impairment, *see generally* Doc. 18, and the record of physical impairments is limited, showing only intermittent knee pain, *see generally* Tr. 345–46, 455–68, 517–27. This report and recommendation omits discussion of physical impairments as unnecessary to decide the issues raised.

4

education law."[9] Tr. 433, 472. The psychologist explained, "Jimmy has been identified as eligible for service as a mildly mentally handicapped student. The least restrictive environment has been [the] part-time general education/part-time special education program." Tr. 433, 472.

The psychologist detailed Rawls's educational history, which reflected developmental delays in preschool, participation in special and general education programs, and varying intelligence-test scores, but mostly "borderline":

| Date | Age | Score |
|------|-----|-------|
| March 1982 | 5 | Stanford-Binet LM IQ 75 |
| August 1984 | 7 | WISC-R[10] verbal 70, performance 72, full scale 70 |
| 1985 or 1986 | 8 or 9 | WISC-R verbal 81, performance 100, full scale 89 |
| Fall 1986 | 9 or 10 | WISC-R verbal 65, performance 82, full scale 71 |

Tr. 434, 473.

The psychologist tested Rawls anew, this time using WISC-III, resulting in new IQ scores: verbal 50, performance 69, and full scale 56. Tr. 435, 474. The psychologist remarked,

> Jimmy's performance during this evaluation was weaker than that demonstrated during earlier evaluations. While he exerted good work effort and attempted all problems, deficits in reasoning skills in both verbal and visual formats were apparent. Visual reasoning skills were an area of relative strength, although his score was within the deficient range. Difficulty with visual-perceptual skills inhibited Jimmy's performance on the Block Design subtest. Verbal reasoning skills continue to be an area of particular weakness for Jimmy. He has had difficulty developing logical and abstract reasoning skills. His

_____

[9] The SSA considers school records "an excellent source of information concerning function and standardized testing." 20 C.F.R. Part 404, Subpart P, App. 1, § 112.00C (2015).

[10] The WISC-R is the Wechsler Intelligence Scale for Children-Revised. The WISC-III is the Wechsler Intelligence Scale for Children-III. The WAIS-III is the Wechsler Adult Intelligence Scale-III.

> vocabulary development is also weak. Jimmy's performance during this evaluation indicates continued eligibility for service within the program for mildly mentally handicapped students.

Tr. 436, 475. The psychologist assessed Rawls's social skills as an "area of relative strength" and his communication skills as an "area of particular delay." Tr. 437, 476.

In February 1995 (age 18), Rawls underwent another three-year psychoeducational re-evaluation by a school psychologist. Tr. 439, 478. The psychologist again tested Rawls anew, this time going back to WISC-R (in addition to other tests), resulting in new scores: verbal 77, performance 92, full scale 82, "Adjusted IQ" 88, classification "low average," and percentile 12. Tr. 440, 479. The psychologist observed,

> James responded much better to the adult scale than what he did on the last evaluation. The records show his I.Q. scores have varied considerably over the years. His verbal I.Q. which correlates well with the development of language arts was Borderline. Non-verbal 'hands on' tasks were easier for him.

Tr. 440, 479. Based on other tests, the psychologist opined, "James' standard scores in reading are very close to his verbal I.Q. score which correlates well with the development of skills in language arts," but his "math computation continues to be well below his potential." Tr. 440, 479.

The psychologist opined Rawls would continue to benefit from an individualized education program, adding, "It is the opinion of this examiner that … James remains eligible for special education identification and the case conference could convene to determine … programming in the least restrictive environment. His I.Q. score on the adult scale was borderline as well as reading comprehension. It is near a level of literacy. His math score was in the range of the mildly mentally handicapped." Tr. 440–41; 479–80.

In a March 1995 (age 18) "Case Conference Committee Report," a special-education coordinator checked, "No known problems" under "Pertinent Health Data,"

checked, "Mildly Mentally Disabled," as justification for eligibility for special services, found the least restrictive environment for Rawls was a combination of special and general programs, and stated, "Jimmy has worked very hard this year. He is on target to graduate on time. No difficulties were discussed." Tr. 447, 448, 490.

In a February 1996 (age 19) "Case Conference Committee Report," a special-education coordinator checked, "No known problems" under "Pertinent Health Data," observed Rawls is on track to graduate if he passes English and Government, and stated, "Jim is planning to enter the work force upon graduation, but does not have a full-time job secured. Info. on voc. rehab. services was given to parents." Tr. 443, 482.

In June 1996 (age 19), Rawls was graduated from high school. Tr. 343, 430, 469. He received mostly Bs and Cs but sometimes received As and Ds. Tr. 430. He generally ranked in the middle of his class of 120 students (give or take some students depending on the semester). Tr. 430. Most semesters, he participated in a work/study program as a janitor, dishwasher, and pool attendant. Tr. 334, 336, 343, 430.

From 1999 to 2001 (approximately ages 22 to 25), Rawls worked as a bagger at a grocery store for five hours a day, five days a week. Tr. 334, 336, 343, 351. He stopped working when the store closed. Tr. 342. Later asked, "Even though you stopped working for other reasons, when do you believe your condition(s) became severe enough to keep you from working," he answered March 31, 2001. Tr. 342.

The record is generally silent about the next twelve years.

On August 19, 2013, Rawls applied for benefits. Tr. 318–24, 325–28.[11]

---

[11]Although unclear from the record (and not pertinent to any issue), the passage of time before Rawls applied for benefits may be explained by the fact that his father died on July 4, 2012, Tr. 318, and the possibility that he explored entitlement to benefits thereafter. To be eligible for child's insurance benefits based on survivorship, the applicant's worker-parent must be deceased. 42 U.S.C. § 402(d); 20 C.F.R. § 404.350 (2015).

2.      *Later Evidence (Medical Opinions, Testimony, and Other Evidence)*

a.      <u>Kenneth Visser, Ph.D.</u>

In October 2013 (age 36), to evaluate the applications, Kenneth Visser, Ph.D., conducted a clinical evaluation and mental status intellectual evaluation of Rawls. Tr. 507. He reviewed Rawls's test scores from 1992 (age 15) and 1995 (age 18). Tr. 507. He completed his own testing, including using the WAIS-III, resulting in new scores: verbal comprehension 72, perceptual reasoning 71, working memory 66, processing speed 76, full scale 66. Tr. 511. He remarked, "The scores that he achieved at this time were between the [l]owest scores that he has had in the past, at the age of 15, and then when [he] was the age of 18." Tr. 511. He observed composite scores revealed "significant problems in every area." Tr. 511.

Dr. Visser observed Rawls had uncombed hair, generally appeared unkempt, exhibited no unusual behavior, had a slight speech impediment, had unclear articulation, had a euthymic mood, had a congruent affect, appeared "matter-of-fact," listened to questions, and responded by staying on topic and presenting information logically. Tr. 508–09.

Dr. Visser diagnosed Rawls with borderline intellectual functioning and dependent personality characteristics. Tr. 512. As stressors, Dr. Visser identified limited autonomy and lack of a vocation. Tr. 512. He observed, "[Rawls] does not make decisions that place him or others at risk. At the same time, over the last several years, he has shown little in the way of proactive behavior." Tr. 512. He opined, "People functioning within the Borderline level are often functioning with some type of work capacity. In the case of Mr. Rawls, some Dependency characteristics were also evident." Tr. 512. He observed: Rawls's mother brought him to the appointment; she "is a dominant force in his life"; she "seems to be quite directive with him"; he "has a strong connection with [her], but has a limited individual identity"; he lives with her and has "very few outside activities"; and he "shows tendencies toward dependency." Tr. 508, 513, 514. He opined Rawls "presented as a person functioning

8

Below Average, but at a level not uncommon in the workforce." Tr. 514. His prognosis for Rawls was "Guarded" because of Rawls's "long history of learning problems" and "tendency to be dependent." Tr. 514.

b.   Theodore Weber, Psy.D.

In January 2014, based on a review of the school records and Dr. Visser's evaluation, non-examining state agency consultant Theodore Weber, Psy.D., opined Rawls has severe learning and personality disorders; mild restrictions in activities of daily living and maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace; and has had no repeated episodes of decompensation of an extended duration. Tr. 142, 145. He opined Rawls is not significantly limited in abilities to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; and to make simple work-related decisions. Tr. 145. He opined Rawls is moderately limited in abilities to understand and remember detailed instructions; to carry out detailed instructions; and to maintain attention and concentration for extended periods. Tr. 145. He opined Rawls has no social interaction or adaption limitations. Tr. 146.

To explain his opinions, Dr. Weber observed Rawls has been in the workforce, independently manages his finances, and has no significant psychiatric history. Tr. 146. He opined the scores from March 1992 (age 15) were "clearly an underestimation due to situational factors and/or respond style." Tr. 146. He opined the scores from February 1995 (age 18) showing "low average intelligence with a learning disorder" "is the best indicator of [Rawls's] mental capacity." Tr. 146. He opined Dr. Visser's evaluation was "fair overall" and without evidence of significant mental problems or restrictions that would preclude simple repetitive tasks. Tr. 146. He opined, "The

history and the evidence of the file do not support mental retardation[12] or any significant intellectual in/or cognitive problems or restrictions." Tr. 146. He concluded Rawls appears able to understand and remember simple instructions and sustain them; to complete routine mental tasks and make simple work-related decisions without special supervision; and to relate appropriately with coworkers and supervisors. Tr. 146. He opined the evidence was insufficient to provide opinions about the earlier periods. Tr. 143–44.

c.  Disability Report

In a Disability Report completed in March 2014, for the question, "What changes have occurred in your daily activities since you last completed a disability report," Rawls responded, "I continue to do less and less." Tr. 387.

---

[12]In 2013, the SSA changed the terminology in its regulations from "mental retardation" to "intellectual disability," 78 Fed. Reg. 46499-01 (Aug. 1, 2013), explaining,

> The term "intellectual disability" is gradually replacing the term "mental retardation" nationwide. Advocates for individuals with intellectual disability have rightfully asserted that the term "mental retardation" has negative connotations, has become offensive to many people, and often results in misunderstandings about the nature of the disorder and those who have it.

> In October 2010, Congress passed Rosa's Law, which changed references to "mental retardation" in specified Federal laws to "intellectual disability," and references to "a mentally retarded individual" to "an individual with an intellectual disability." Rosa's Law also required the Federal agencies that administer the affected laws to make conforming amendments to their regulations. Rosa's Law did not specifically include titles II and XVI of the Act within its scope, and therefore, did not require any changes in our existing regulations. However, consistent with the concerns expressed by Congress when it enacted Rosa's Law, and in response to numerous inquiries from advocate organizations, we are revising our rules to use the term "intellectual disability" in the name of our current listings and in our other regulations.

*Id.*

d.   First Hearing

In April 2016, the ALJ conducted the first hearing. Tr. 50–71. At the outset, Rawls's attorney objected that Dr. Visser had failed to evaluate Rawls to determine if he satisfied Listing 12.05 (2015).[13] Tr. 51–52.

Rawls testified he lives with his mother, has a girlfriend he sees every Sunday, watches television and uses the computer to play games and use Facebook, and has had difficulty getting a driver's license, having failed the test six times due to reading difficulties. Tr. 52–62. He testified he works for cash as a cook six days a week at a gas station owned by a friend and has worked there for 14 years. Tr. 54–57, 61.

Near the end of the hearing, Rawls's attorney argued Rawls "really should be evaluated under listing 12.05." Tr. 69.

e.   Suniti Kukreja-Barua, Ph.D.

After the hearing, the ALJ asked Dr. Kukreja-Barua, to answer interrogatories to help determine Rawls's "ability to do work-related activities on a sustained basis." Tr. 396–404. The ALJ sought information for October 10, 1998, to "PRESENT," adding, "Alleged Onset Date: April 1, 2000."[14] Tr. 400 (emphasis in original).

---

[13]Listing 12.05, addressing intellectual disability, is discussed in detail in § V.A of this report and recommendation. For now, to understand the objection by Rawls's attorney and later evidence, suffice it to say the listing requires significantly subaverage general intellectual functioning; deficits in adaptive functioning initially manifested during the developmental period (i.e., onset of the impairment before age 22); and, for someone with a valid verbal, performance, or full scale IQ of 60 through 70, either a physical or other mental impairment imposing an additional and significant work-related limitation of function or at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App. 1, Part A-2, § 12.05 (2015).

[14]This is an apparent reference to Rawls's "date first insured" for disability insurance benefits, Tr. 109, 137, 163, 329. Under SSA procedures, the date first insured becomes the established onset date if the date first insured arises after the alleged onset date. SSA Program Operations Manual System ("POMS"), DI 25501.310.C.2.

In May 2016, Dr. Kukreja-Barua answered the interrogatories based on her review of the evidence. Tr. 528–35.

By checking boxes, Dr. Kukreja-Barua opined Rawls has no restrictions in understanding, remembering, and carrying out simple instructions; mild restriction in making judgments on simple work-related decisions; and moderate restrictions in understanding, remembering, carrying out, and making judgments on complex work-related decisions. Tr. 528. To support her opinions, she cited one page of Dr. Visser's evaluation (page 5, which addresses test scores, Tr. 511) and added, "Verbal comprehension may be more challenged than performance on speeded task[] + poor working memory." Tr. 528.

By checking boxes, Dr. Kukreja-Barua opined Rawls has no restrictions in interacting appropriately with the public, supervisors, or coworkers; and moderate restrictions in responding appropriately to usual work situations and to changes in a routine work setting. Tr. 529. To support her opinions, she cited one page of Dr. Visser's evaluation (page 7, which addresses "Summary-Effect of Problems on Life," "Capabilities," and "Daily Living Restrictions," Tr. 513). Tr. 529.

Dr. Kukreja-Barua opined Rawls's impairment affects no other capabilities. Tr. 529. For the question, "[I]f you have sufficient information to form an opinion within a reasonable degree of medical or psychological probability as to past limitations, on what date were the limitations you found above first present," she wrote, "1982," when Rawls would have been 5 or 6. Tr. 529.

Elsewhere, by making Xs, Dr. Kukreja-Barua opined Rawls has mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace; and has had no repeated episodes of decompensation of an extended duration. Tr. 532. To support her opinions, she cited one page of Dr. Visser's evaluation (page 7, which addresses "Summary-Effect of Problems on Life," "Capabilities," and "Daily Living Restrictions," Tr. 513). Tr. 532.

12

For the question, "Is there sufficient objective medical and other evidence to allow you to form opinions about the nature and severity of the claimant's impairment(s) during the relevant time period," Dr. Kukreja-Barua marked, "Yes." Tr. 531. For the directives, "Please specify the claimant's impairments, if any, established by the evidence. … Cite the objective medical findings that support your opinion, with specific references (exhibit or page number) to the evidence we provided from the case record," Dr. Kukreja-Barua wrote, "12.05 Intellectual Disability. Exhibit 1F, 3F, 4F." Tr. 531. (Exhibits 1F and 3F are school records, Tr. 430–54, 469–506; Exhibit 4F is Dr. Visser's evaluation, Tr. 507–16.)

For the question, "Do any of the claimant's impairments established by the medical evidence, combined or separately, meet or medically equal the criteria for any impairment described in the Listing of Impairments[?]," Dr. Kukreja-Barua marked, "No," and added, "Considered 12.05 Intellectual Disability, but it doesn't fully meet criteria A, B, C or D." Tr. 533.

f.   <u>Second Hearing</u>

Upon receipt of Dr. Kukreja-Barua's answers, Rawls's attorney requested another hearing. Tr. 420–21.

In August 2016, the ALJ conducted another hearing, this time with Dr. Kukreja-Barua present as a witness. Tr. 72–101. Rawls again testified about his current job at the gas station.[15] Tr. 77–79. Dr. Kukreja-Barua then testified:

> Q    [ATTORNEY] Dr. Barua, a child who requires special education from preschool forward throughout the rest of his schooling,

---

[15]Because Rawls is paid in cash for his work at the gas station, Tr. 54, it is unclear how long he has worked there. His testimony (14 years) and his attorney's representation (started in 2016) differ. Tr. 54, 55, 78. Although his attorney suggested Rawls misspoke, the attorney may have misspoke; the record indicates Rawls was working at "Marathon Gas Station" at least as early as August 2013, *see* Tr. 455, and the 14-year period Rawls conveyed in both his April and August 2016 testimony, Tr. 54, 78, roughly correlates with the cessation of his previous job at the grocery store in 2001, Tr. 343, 351.

needed to repeat first grade, that would reflect deficits in adaptive functioning as a child, wouldn't it.

A       [DR. KUKREJA-BARUA] Yes. …

Given the information that we have is based on his IQ testing, … the score that he received does not meet the criteria for -- the required score has to be full-scale IQ of less than 59, and Mr. Rawls' performance is better than that.

Q       [ATTORNEY] Did you see … where Dr. Visser did the most recent IQ testing and he had an IQ score of 66. The full-scale was 66 as well as the working memory was 66.

A       [DR. KUKREJA-BARUA] Yes, that is still better than 59, because to meet the criteria it has to be 59.

…

Q       [ALJ] Doctor, were you referring to IQ testing at age 18?

…

A       [DR. KUKREJA-BARUA] The diagnosis that we're making is this under disability evaluation for Social Security, and the criteria here is a little bit different from the DSM. So the claimant's presentation here starting from 1982 which he was six years old, he had full-scale IQ of 75. In 1984 his full-scale IQ was recorded at 70, in 1986 was 89, 1989 was 71. So with that and it goes on up until 2013 was 72.

Q       [ALJ] Under our rules, Doctor, we can only consider IQ scores beginning at age 16.[16] If you can, the first IQ testing after age 16, that seems to be where we –

---

[16]SSA regulations provide, "Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above." 20 C.F.R. Part 404, Subpart P, Part A-2, App. 1, § 12.00(D)(10) (2015).

A    [DR. KUKREJA-BARUA] … [A]ll right. In 1992 he was reevaluated and then 1995 his full-scale IQ was 82.

…

Q    [ATTORNEY] [I]f you look at 3F page 6 [school records conveying scores from March 1992 (age 15) testing] his full-scale IQ was 56, his performance IQ score was 69, and his verbal IQ score was 50. …

A    [DR. KUKREJA-BARUA] Yes, you're right. No, I'm not looking at the score to be in the 80s, the score criteria should be 59 or less. And you are right, the full-scale IQ on this report is less than 59. But in the big scheme of things this is also a one-time incident. After this in 1995 his score went up to 82.

The variability in scores is normal, but if you look at the range this is probably the only one that was under 59. And these could be affected, the performance could be affected by having a bad day and not having slept well or any of those things.

…

Q    [ATTORNEY] Dr. Barua, are you familiar with listing 12.05? … And (c) and (d) require an IQ score of somewhere between 60 through 70, it does not have to be 59 or less. Is that correct?

A    [DR. KUKREJA-BARUA] Right.

Q    [ATTORNEY] So based on that, the IQ scores reflected on Exhibit 3F page 6 [school records conveying scores from March 1992 (age 15) testing] could satisfy the criteria of (c) or (d), couldn't they.

A    [DR. KUKREJA-BARUA] Right. But it's with—

Q    [ATTORNEY] That's just my question for now. …

Tr. 80–83.

Q    [ATTORNEY] A 39-year-old man who lacks skills of independent living, still lives with his mother, needs help reading instructions from a doctor or pharmacist, and needs supervision to perform simple tasks, never passed a driver's test, failed it six times, would be considered to have marked restrictions in daily activities, wouldn't he.

…

[ALJ] Well, if you want a complete question, counsel, we really should include the work activity.

[ATTORNEY] It's in a sheltered work setting, Your Honor. He's not even making minimum wage. It's not substantial gainful—

[ALJ] And I don't recall, do we have—without even input from the employer then.

…

Q    [ATTORNEY] A 39-year-old man who lacks skills of independent living, still lives with his mother, needs help reading instructions from a doctor or pharmacist, needs supervision to perform simple tasks, failed his driver's license test six times and never passed it, such a person would be considered to have marked restrictions in daily activities, wouldn't they.

A    [DR. KUKREJA-BARUA] Do you know where that is documented? On what exhibit?

Q    [ATTORNEY] Yes, I can read through it with the page numbers.

[ALJ] For the question, Doctor, just assume the accuracy of the information given to you. Based on just what Attorney Schmoyer said, your response, please.

A    [DR. KUKREJA-BARUA] Okay. That would be [INAUDIBLE] and marked disability. …

Q    [ATTORNEY] That would be marked, is that what you said?

A    [DR. KUKREJA-BARUA] Uh-huh. …

Q    [ATTORNEY] Thank you. A person with a personality disorder that is described as severe would have marked difficulties in social functioning, wouldn't they.

A    [DR. KUKREJA-BARUA] Yes. …

Q    [ATTORNEY] A person who required extra time when taking tests in school, that was part of his special education requirement, needs supervision to perform simple tasks, has psychological test

16

results that confirmed an extremely low working memory of 66 and a full-scale IQ of 66 also would have marked difficulties in maintaining concentration, persistence or pace.

A    [DR. KUKREJA-BARUA] Yes, that sounds like it meets criteria (c). …

Tr. 86–88.

Q    [ALJ] Doctor, … do you believe marked limitations exist upon activities of daily living based upon what -- your file review?

A    [DR. KUKREJA-BARUA] Based on Exhibit 4, there are some disabilities and [INAUDIBLE] limited, and that is on page 5, Your Honor. He is able to follow simple instructions but he has difficulty with complex instructions. And that also is a function of difficulties with working memory, so that's also evidence that he has more difficulty with verbal comprehension than performance. So if you put away the pressure of speeded tasks and give him his time, the counsel did mention that he needed extra time to do the tasks and he finishes work, then he will be able to successfully complete the tasks. … And based on Exhibit 4F page 7 [addressing    "Summary-Effect    of    Problems    on    Life," "Capabilities," and "Daily Living Restrictions," Tr. 513)], I answered the questions on the interaction with public, with other people. Has difficulty in responding to usual work situations and routine.

Q    [ALJ] If after age 16, and that's important here for our consideration, Doctor, you have IQ scores that varied -- … how do you … take a high score, do you take the middle score if you have scores that vary after age 16?

A    [DR. KUKREJA-BARUA] After age 16 the scores should be pretty consistent. The only variability, like I mentioned earlier, Your Honor, would be if he had had a bad day, if he hadn't slept well before performing the test, that can expect the performance to be poor. But if you can see a good score, that means that he's capable of performing a good score. I would take the best scores[.]

Tr. 88–90.

In a post-hearing letter to the ALJ, Rawls's attorney argued Dr. Kukreja-Barua's testimony established Rawls "meets Listing 12.05D, due to his intellectual

disability," because the testimony confirmed Rawls "had deficits in adaptive functioning as a child"; had "marked restrictions in daily activities"; had "marked difficulties in social functioning"; and had "marked difficulties in maintaining concentration, persistence, or pace." Tr. 428.

## C.   *ALJ's Decision*

On September 19, 2016, the ALJ issued a decision. Tr. 19–31.

At step one, the ALJ found Rawls had not engaged in substantial gainful activity from October 30, 1998 (the alleged onset date), to September 19, 2016 (the decision date). Tr. 22.

At step two, the ALJ found Rawls has had the severe impairment of "borderline intellectual functioning" since October 30, 1998 (the alleged onset date), and the severe impairments of "borderline intellectual functioning and dependent personality disorder" beginning on August 19, 2013. Tr. 22.

At step three, the ALJ's analysis split for the different time periods, resulting in an unfavorable decision for the earlier period and a favorable decision for the later period. Tr. 22–30.

For the earlier period—before November 30, 1998 (before he turned 22), and before September 30, 2002 (the date last insured)—the ALJ found Rawls had had no impairment or combination of impairments that meets or medically equals the severity of any impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1 (2015). Tr. 22. The ALJ found Rawls had had a mild restriction in activities of daily living; a moderate restriction in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace; and had had no episodes of decompensation of an extended duration. Tr. 23. The ALJ found Rawls had not met Listing 12.05 (2015):

18

The claimant's impairment did not meet or equal listing 12.05, Intellectual Disability, prior to attaining age 22 and prior to September 30, 2002. Intellectual disability refers to significantly subaverage general intellectual functioning. The significantly subaverage general intellectual functioning must be accompanied by deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22. …

…

There is little, if any, evidence of IQ testing after the claimant reached the required age of 16 that would support listing 12.05A, 12.05B, or 12.05C (See, e.g., Ex. 1F, 3F [school records]), as discussed below. Further, even if IQ scores met listing 12.05C, there is little, if any, evidence of a physical or other mental impairment imposing an additional and significant work-related limitation of function during the relevant period. As noted above and discussed below, there is little, if any, evidence of marked limitations during this period, as well. The claimant's impairment did not meet or equal listing 12.05, Intellectual Disability, prior to attaining age 22 and prior to September 30, 2002.

Tr. 23.

For the later period—beginning on August 19, 2013—the ALJ found Rawls satisfied the criteria for Listing 12.05 (2015) because he "has mental retardation initially manifested before age 22 with a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Tr. 28. The ALJ therefore found Rawls "became disabled" on August 19, 2013. Tr. 30.

In finding Rawls satisfied the criteria for Listing 12.05 (2015) for the period beginning on August 19, 2013, the ALJ referenced the earlier IQ tests (from March 1992 (age 15) and February 1995 (age 18)) as evidence that Rawls had manifested intellectual disability before age 22. Tr. 28. The ALJ referenced the later IQ test administered by Dr. Visser as evidence that Rawls's full scale IQ is 66 and within the range for Listing 12.05 (2015) (60 to 70). Tr. 28, 29. The ALJ referenced Dr. Visser's diagnosis of dependent personality characteristics and found they inherently cause

19

adaptive limitations as evidence that Rawls has "an additional mental impairment imposing an additional and significant work-related limitation of function" for the second criterion to meet Listing 12.05 (2015). Tr. 28. The ALJ found Rawls's testimony generally consistent with the Listing 12.05 (2015) finding. Tr. 29.

The ALJ gave Dr. Visser's opinions "great weight" to the extent they were consistent with the Listing 12.05 (2015) finding. Tr. 29.

The ALJ gave Dr. Weber's opinions "little weight," finding they were "not well supported or explained" and observing Dr. Weber failed to discuss Listing 12.05 (2015). Tr. 29–30.

The ALJ gave Dr. Kukreja-Barua's opinions "little weight," finding her written answers were "not well supported or explained, generally consisting of one-sentence conclusions with no explanation" and "internally inconsistent, [with opinions of] both only mild 'b' criteria and moderate to significant limitations," and finding her oral testimony was "likewise overbroad and unsupported." Tr. 30.

Because the ALJ found Rawls met Listing 12.05 (2015) for the period beginning on August 19, 2013, the ALJ proceeded to the next steps only for the period before November 30, 1998 (before he turned 22), and before September 30, 2002 (the date last insured). Tr. 24–28.

After stating he had considered the entire record, the ALJ found that, for the period before November 30, 1998 (before he turned 22), and before September 30, 2002 (the date last insured), Rawls had possessed the RFC "to perform a full range of work at all exertional levels," with nonexertional limitations: simple, routine tasks; occasional changes in work routine; occasional interactions with coworkers and supervisors; no interaction with the public; and better abilities with things than people. Tr. 24. The ALJ explained,

> Despite the claimant's history, the only testing during the relevant
> period showed performance well above previous testing, with scores

20

instead in the borderline to low average range. In February of 1995, the claimant underwent a psycho-education re-evaluation with school psychologist William E. Haworth. The school psychologist administered a battery of tests, including a Bender-Gestalt, which was normal. He also administered a Wechsler Adult Intelligence Scale-R (WAIS-R). The claimant reportedly scored in the low average range test, rather than the borderline intellectual functioning range. The claimant[] reportedly obtained a Verbal IQ score of 77, a Performance IQ score of 92, and a Full Scale IQ score of 82, in the low average range. The school psychologist stated, that, while the claimant's scores had varied considerably over the year, his Verbal IQ score correlated well with the development of language arts, at borderline. He was noted to have done much better on the adult test, with the psychologist stating that hands-on tasks were easier for the claimant. The claimant was also administered a Kaufman Test of Educational Achievement, which reportedly showed reading scores that the school psychologist noted to be very close to his Verbal IQ score, which was noted to correlate well with the claimant's development of skills in the language arts. The school psychologist did state, however, that the claimant's math computation continued to be "well below [the claimant's] potential." The claimant was found eligible for continued special education, with notes that his score on the adult scale was borderline, with reading comprehension near a level of literacy. His math scores, which the school psychologist previously noted to be well below his potential, was noted to be in the mildly mentally retarded range. Overall, however, acceptable intelligence testing showed the claimant to function in the borderline range (Ex. 1F, 3F).

An individualized education program (IEP) completed soon afterward showed continued special education, with no other problems. The claimant had a review of his case in March of 1995. The claimant was noted to have no known health problems at the time. Review of the evaluation above showed the claimant to continue to be eligible for services. He was noted to have worked hard that year and to be on target to graduate. Despite being in special education in English, Government, and Work-Study classes, his least restrictive environment was to be in the general classroom for 55 percent of the day (Ex. 1F, 3F).

At an exit conference a year later, the claimant was again noted to have no health problems. He was noted to be expected to graduate at the end of the spring 1996 semester, assuming he passed English and Government classes. The claimant appears to have reported that he wished to enter the workforce on graduation, but did not have a job. His parents were reportedly given instructions regarding vocational rehabilitation. Little further note was made about the claimant's special

education (Ex. 1F, 3F). He reportedly graduate[d] from high school in 1996 (See Ex. 2E).

The claimant does appear to have obtained a job after graduation. He reportedly worked bagging groceries for three years, from 1999 to 2001 on a part-time basis (See Ex. 2E, 3E). There is little, if any, further evidence regarding the claimant's functioning during the relevant period. Function reports appear to focus on the claimant's functioning at the time of application (See, e.g., Ex. 6E, 7E).

The claimant's testimony … was consistent with his diagnosis of borderline intellectual functioning, but there was little, if any, evidence presented of any other impairment diagnosis during the relevant period.

Tr. 24–25.

At step four, for the period before November 30, 1998 (before he turned 22), and before September 30, 2002 (the date last insured), the ALJ found Rawls had engaged in no past relevant work. Tr. 26.

At step five, for the period before November 30, 1998 (before he turned 22) and before September 30, 2002 (the date last insured), the ALJ found, "considering [Rawls's] age, education, work experience, and [RFC]," there had been jobs "in significant numbers in the national economy that [Rawls] could have performed." Tr. 27. The ALJ identified "representative occupations" of "box truck washer" (DOT 529.687-018), "block inserter" (DOT 652.687-018), "harvest worker" (DOT 40.2687-014), and "table worker" (DOT 521.687-102). Tr. 27.

The ALJ thus found Rawls "was not disabled prior to August 19, 2013, … but became disabled on that date, and has continued to be disabled through the date of this decision"; "was not under a disability within the meaning of the Social Security Act at any time through September 30, 2002, the date last insured"; and "has not been under a disability, as defined in the Social Security Act, at any time prior to November 29, 1998, the date he attained age 22." Tr. 30.

## IV.   Standard of Review

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* If substantial evidence supports the Commissioner's decision, a court must affirm, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

"This restrictive standard of review applies only to findings of fact," and "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standard to be applied in reviewing claims." *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoted authority omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## V.   Law & Analysis

### A.   *First Argument (Doc. 18 at 7–11)*

Rawls first argues substantial evidence does not support the ALJ's finding that his disability began on August 19, 2013, Doc. 18 at 7–11. Specifically, he argues, "Given the Commissioner's acceptance of Dr. Visser's … opinion as a basis for assessing disability with an onset date of August 19, 2013, and the nature of dependent personality disorder and borderline intellectual functioning, the Commissioner's decision to only accept the diagnoses as of August 19, 2013 is not rational. The onset date of August 19, 2013 has no medical basis in the record." Doc. 18 at 7.

SSA regulations set forth responsibilities concerning evidence. 20 C.F.R. § 404.1512 (2015). A claimant has the burden of proving disability and the duty of informing or submitting evidence known to the claimant relating to whether he is disabled. 20 C.F.R. § 404.1512(a) (2015). The evidence must show how the claimant's impairments affect his functioning during the time he says he is disabled and any other information the SSA needs to decide his claim. 20 C.F.R. § 404.1512(c) (2015). The SSA has the burden of developing the claimant's complete medical history for at least the twelve months before the application date. 20 C.F.R. § 404.1512(d)(2) (2015).

The onset date of a disability is "the first day an individual is disabled." Social Security Regulation ("SSR") 83-20, 1983 WL 31249, at *7 (S.S.A. 1983). Factors pertinent to the onset date for disabilities of non-traumatic origin include the claimant's allegations, his work history, and the medical and other evidence related to the severity of his impairment. *Id*. at *2. Of the factors, medical evidence is the primary evidence. *Id*. at *2. The date alleged by the claimant should be used in determining the date of onset of disability only if consistent with available evidence. *Id*. at *3.

When a claimant applies for supplemental security income, "the earliest month for which [the SSA] can pay [him] benefits is the month following the month [he] filed the application." 20 C.F.R. § 416.335 (1996). If he applies "after the month [he] first meet[s] all the other requirements for eligibility, [the SSA] cannot pay [him] for the month in which [his] application is filed or any months before that month." *Id*. Thus, when establishing the onset date for supplemental security income,

> **Onset will be established as of the date of filing provided the individual was disabled on that date**. Therefore, specific medical evidence of the exact onset date need not generally be obtained prior to the application date since there is no retroactivity of payment because title XVI [supplemental security income] payments are made beginning with the date of application provided that all conditions of eligibility are met.

SSR 83-20, 1983 WL 31249, at *7 (S.S.A. 1983) (emphasis added).

24

In the Listing of Impairments, "for each of the major body systems," the SSA describes "impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a) (2011). The Listing of Impairments is structured to match the definition of "disability," which "includes two limiting elements: a definition of impairment and a severity requirement." *Randall v. Astrue*, 570 F.3d 651, 657 (5th Cir. 2009) (citing 42 U.S.C. § 423(d)(1)(A)).

The SSA designed the Listing of Impairments "to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). If a claimant meets or equals an impairment in the Listing of Impairments, he is "conclusively presumed to be disabled and entitled to benefits." *Bowen v. City of New York*, 476 U.S. 467, 471 (1986). If he does not, "the inquiry moves to the fourth step." *Id.* To meet a listing, a claimant must have a medically determinable impairment "that satisfies all of the criteria" in a listing; a diagnosis alone is insufficient.[17] 20 C.F.R. § 404.1525(d); *accord Sullivan*, 493 U.S. at 530.

Listing 12 "addresses nine specific mental disorders and begins with a set of [mandatory] introductory instructions." *Randall*, 570 F.3d at 657. Like other listings structured to match the definition of "disability," "every mental disorder listing includes two independent components: a diagnostic description of the disorder and specific criteria measuring the disorder's severity." *Id.* "To ensure that the severity determination is not confused with the predicate determination of impairment, [the introductory instruction] separates the requirements and requires satisfaction of *both*: '[The SSA] will find that [a claimant has] a listed impairment if the diagnostic description in the introductory paragraph *and* the criteria … are satisfied.'" *Id.* (quoting Listing 12.00A (2015); emphasis in *Randall*).

---

[17]To equal a listing, the evidence must show an impairment at least equal in severity and duration to the criteria of a listing. 20 C.F.R. § 404.1526(a) (2011).

Listing 12.05 (2015) concerns intellectual disability. For the diagnostic description, the listing provides, "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning[18] initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App. 1, Part A-2, § 12.05 (2015).

For the required severity, Listing 12.05 (2015) provides "the requirements in **A**, **B**, **C**, or **D**" must be satisfied: "**A.** Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded"; "**B.** A valid verbal, performance, or full scale IQ of 59 or less"; "**C.** A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function"; or "**D.** A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." *Id.* (emphasis added).[19]

---

[18]The SSA does not define "adaptive functioning." For a definition, courts, including the Eleventh Circuit, refer to the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), which states adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociological background, and community setting." *See, e.g.*, *Jones v. SSA*, 695 F. App'x 507, 509 n.3 (11th Cir. 2017) (citing DSM-V at 37); *James v. Comm'r Soc. Sec.*, 657 F. App'x 835, 837 (11th Cir. 2016) (citing DSM-IV-TR at 42); *O'Neal v. Comm'r Soc. Sec.*, 614 F. App'x 456, 459 (11th Cir. 2015) (same).

[19]A finding a claimant does not satisfy Listing 12.05 may be implicit. *James*, 657 F. App'x at 838 (citing *Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)).

Thus, to satisfy Listing 12.05 (2015), the evidence must show both: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., onset of the impairment before age 22 (the diagnostic description); and (2) satisfaction of **A**, **B**, **C**, or **D** (the severity requirement). *Randall*, 570 F.3d at 660–61 (citing various Eleventh Circuit cases); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *Bardge v. Berryhill*, 746 F. App'x 907, 908 (11th Cir. 2018).

Subsections **A** and **B** (with reference to an IQ of 59 or less or preclusion of the use of standardized measures of intellectual functioning) capture disorders the SSA considers "severe enough to prevent … doing any gainful activity without any additional assessment of functional limitations." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00A (2015). Recognizing that someone with an IQ between 60 and 70 may well be able to work fulltime, subsections **C** and **D** require something more than just the IQ itself. *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007).[20] For subsection **C**'s requirement of "a physical or other mental impairment imposing an additional and

---

[20]"In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQ are provided in the Wechsler series," the SSA uses "the lowest of these in conjunction with 12.05." 20 C.F.R. Part 404, Subpart P, App. 1, Part A-2, § 12.00(D)(6)(C) (2015); *accord* POMS DI 24515.055.

Because an individual's IQ remains fairly constant absent a traumatic event, his presentation of a valid IQ score of 70 or less creates a presumption that his subaverage general intellectual functioning with deficits in adaptive functioning manifested before age 22. *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001). The presumption may be rebutted. *Popp v. Heckler*, 779 F.2d 1497, 1499–1500 (11th Cir. 1986). An ALJ does not err in failing to mention the presumption if the ALJ does not challenge that the claimant's "low IQ began before age twenty-two." *Garrett v. Astrue*, 244 F. App'x 937, 939 (11th Cir. 2007). Even if the presumption is not rebutted, to meet subsection **C**, the claimant "must still show that he meets the last requirement … which is that he has 'a physical or other mental impairment'—in addition to his low IQ—'imposing an additional and significant work-related limitation of function.'" *Rudolph v. Comm'r Soc. Sec.*, 709 F. App'x 930, 933 (11th Cir. 2017).

Here, the ALJ did not mention the presumption but did not need to because he found the evidence demonstrates onset of Rawls's subaverage general intellectual functioning with deficits in adaptive functioning before age 22. Tr. 28.

significant work-related limitation of function," the SSA assesses "the degree of functional limitation" the additional impairment imposes to "determine if it significantly limits [the claimant's] physical or mental ability to do basic work activities," in other words, to determine if it is a "severe" impairment. 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00A (2015). "If the additional impairment[] does not cause limitations that are 'severe,'" the SSA "will not find that the additional impairment[] imposes 'an additional and significant work-related limitation of function.'"[21] *Id.* Impairments that do not qualify as "a discrete, additional impairment," such as short-term-memory issues associated with borderline intellectual functioning, are insufficient. *L.R.M. v. SSA*, 404 F. App'x 415, 417 (11th Cir. 2010).

Rawls shows no reversible error. In accordance with SSA procedure, the ALJ selected August 19, 2013, as the onset date because that is the date on which Rawls filed his application for supplemental security income and, at least by that date, met Listing 12.05 (2015) with evidence consisting of the October 2013 (age 36) evaluation by Dr. Visser finding he had a valid full scale IQ of 66 (for subsections **C** and **D**) and dependent personality characteristics (for the rest of subsection **C**). Tr. 511–12. As the Commissioner observes, "the dispositive issue is not whether [Rawls's] dependent personality disorder began on August 2013, but whether substantial evidence supports the ALJ's finding that [Rawls] did not have a severe impairment of dependent personality disorder prior to September 30, 2002." Doc. 19 at 6.

The answer to that dispositive issue is yes; substantial evidence supports the ALJ's finding that Rawls did not have a severe impairment of personality disorder

---

[21]The standard to satisfy the additional impairment used to be less than "severe." *See Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985) (interpreting prior version of regulations). In 2000, the SSA amended its regulations to "clarify that the additional impairment must be 'severe' in order to establish 'an additional and significant work-related limitation of function.'" 65 Fed. Reg. 50746-01 (Aug. 21, 2000). The amended regulations supersede the old standard. *Willard v. Colvin*, No. 5:12-cv-03536-JHE, 2014 WL 1664300, at *4 (N.D. Ala. Apr. 25, 2014) (unpublished).

before September 30, 2002, or any other "physical or other mental impairment imposing an additional and significant work-related limitation of function" to satisfy Listing 12.05C (2015).

There is no evidence of a diagnosis of a personality disorder or suggestion of dependency traits before September 30, 2002. *See generally* Tr. 338–535. Dr. Visser did not suggest Rawls had dependent personality characteristics before September 30, 2002, and appeared to base his October 2013 diagnosis of dependent personality traits on the interaction with and dependency Rawls, then age 36, had on his mother observed during the October 2013 appointment. *See* Tr. 508, 513, 514 (Dr. Visser's observations she brought Rawls to the appointment; she "is a dominant force in his life"; she "seems to be quite directive with him"; he "has a strong connection with [her], but has a limited individual identity"; he lives with her and has "very few outside activities"; and he "shows tendencies toward dependencies"). Dr. Visser stated Rawls's prognosis is guarded "due to his long history of learning problems, and his tendency to be dependent," suggesting the "long history" applied to his "learning problems" only. *See* Tr. 514. Dr. Visser stated Rawls has shown little in the way of proactive behavior "over the last several years," indicating later onset of dependency characteristics. Tr. 512; *see also* Tr. 387 (Rawls's statement during the later period that he was doing "less and less").

Rawls himself offered little testimony about the period before September 30, 2002, beyond that he had attended school in Indiana and had taken a driver's education course he did not pass. *See generally* Tr. 52–62, 77–81. The school records do not suggest problems beyond those associated with borderline intellectual functioning; to the contrary, they show that, during the period before September 30, 2002, Rawls took both general and educational courses, Tr. 433, 472, had strong social skills, Tr. 437, 476, had low-average scores at age 18 (verbal 77, performance 92, full scale 82, "Adjusted IQ" 88), Tr. 440, 479, participated in a work/study program throughout high school as a janitor, dishwasher, and pool attendant, Tr. 343, 430, worked "very hard" and stayed "on track to graduate on time," Tr. 447, 490, planned

29

to enter the workforce upon graduation, Tr. 443, 482, was graduated from high school, Tr. 343, 430, 469, and worked for more than two years as a bagger at a grocery store for five hours a day, five days a week, leaving only because the store had closed, Tr. 342–43, 351.

That evidence constitutes substantial evidence—such relevant evidence as a reasonable person would accept as adequate to support a conclusion, *see Moore*, 405 F.3d at 1211—to support the ALJ's finding that Rawls did not have a physical or other mental impairment imposing an **additional** and **significant** work-related limitation of function before September 30, 2002, to satisfy Listing 12.05C (2015) before September 30, 2002. Rawls's argument to the contrary—essentially that a diagnosis of dependent personality characteristics in 2013 at age 36 necessarily translates to the existence of a dependent personality disorder or characteristics decades earlier—is unsupported by the law and the record.

With no showing the ALJ failed to apply the correct legal standards, and with substantial evidence to support the underlying factual findings, remand to reconsider the onset date is unwarranted. *See Wilbon v. Comm'r Soc. Sec.*, 181 F. App'x 826, 829 (11th Cir. 2006) (affirming where record constituted "substantial evidence in support of the ALJ's finding that Plaintiff suffered from no additional physical or mental impairment that imposed an additional and significant work-related limitation of function").

**B.    *Second Argument (Doc. 18 at 11–14)***

Rawls next argues the ALJ erred in rejecting opinions of Dr. Kukreja-Barua. Doc. 18 at 11–14. Specifically, he argues the ALJ's "rationale for rejecting Dr. Barua's opinion was not based on substantial evidence and failed to recognize that he was in control of the amount of detail required since Dr. Barua was the Commissioner's own testifying medical expert and the ALJ could have asked more detailed questions." Doc. 18 at 14.

Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c) (2012). A medical opinion is a statement from an acceptable medical source (including a doctor) that reflects judgment about the nature and severity of an impairment. 20 C.F.R. § 404.1527(a) (2012). The SSA considers several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. § 404.1527(c) (2012).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). But an ALJ need not explicitly address each factor, *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011), and "is free to reject the opinion of any physician when the evidence supports a contrary conclusion," *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

The SSA may obtain a consultative examination if needed to determine if the claimant is disabled (for example, if the evidence is not in records from medical sources, the evidence from medical sources cannot be obtained for reasons beyond the claimant's control, there is highly technical or specialized medical evidence unavailable from medical sources, and there is an indication of change in condition but the current severity has not been established).[22] 20 C.F.R. §§ 404.1512(e) (2015); 404.1517 (2015); 404.1519a(b) (2012).

Rawls shows no reversible error. The ALJ stated with particularity the weight given to Dr. Kukreja-Barua's opinions ("little weight," Tr. 30), and the ALJ stated the

---

[22]For an initial determination of a claim involving a mental impairment, the SSA must make "every reasonable effort" to ensure that a "qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable [RFC] assessment." 42 U.S.C. § 421(h)(1). This requirement does not apply to cases heard by an ALJ, where the ALJ has "regulatory flexibility to evaluate mental impairments to determine their severity." *Sneed v. Barnhart*, 214 F. App'x 883, 886 (11th Cir. 2006) (citing 20 C.F.R. § 404.1520a and *Plummer v. Apfel*, 186 F.3d 422, 433 (3d Cir. 1999)).

reasons for that weight (her written answers were "not well supported or explained, generally consisting of one-sentence conclusions with no explanation" and "internally inconsistent, finding both only mild 'b' criteria and moderate to significant limitations," and her oral testimony was "likewise overbroad and unsupported," Tr. 30). Substantial evidence supports those reasons.

In the written answers, Dr. Kukreja-Barua merely checked boxes and cited a few pages from Dr. Visser's evaluation without adding any significant detail and even contradicting herself (for example, opinion Rawls has no restrictions in social functioning and Rawls has mild restrictions in social functioning). *See* Tr. 528–29. During her oral testimony, she provided little elaboration. *See* Tr. 80–83. Moreover, as the Commissioner observes, Doc. 19 at 11, testimony Dr. Kukreja-Barua provided in response to questions by Rawls's attorney were not medical opinions about Rawls based on the record but were general opinions about hypothetical persons based on characteristics selected by Rawls's attorney that omitted a variety of things about Rawls, including work history, school comments, school report cards, and February 1995 (age 18) test scores (verbal 77, performance 92, full scale 82). *See* Tr. 86–88; *see also* Tr. 30 (ALJ's observation that Dr. Kukreja-Barua's testimony in response to questioning by Rawls's attorney was based on "selected facts"). No doctor who considered all pertinent available information about Rawls (not Dr. Visser, not Dr. Weber, and not Dr. Kukreja-Barua) opined he had marked restrictions in daily activities, marked difficulties in social functioning, or marked difficulties in maintaining concentration, persistence, or pace at any time, much less during the earlier period. *See generally* Tr. 507–14 (Dr. Visser); Tr. 142–46 (Dr. Weber); Tr. 80–90, 528–35 (Dr. Kukreja-Barua).

That evidence constitutes substantial evidence—such relevant evidence as a reasonable person would accept as adequate to support a conclusion, *see Moore*, 405 F.3d at 1211—to support the ALJ's decision to give Dr. Kukreja-Barua's opinions little weight. Rawls's argument—essentially that the ALJ cannot use inconsistency or the absence of support to reject Dr. Kukreja-Barua's opinions because the ALJ is

the one who asked for her opinions and had the opportunity to further question her—is unsupported. Rawls points to no law requiring an ALJ to accept an expert's opinions or force clarity and elaboration when neither is provided in the first instance.

With no showing the ALJ failed to apply the correct legal standards, and with substantial evidence to support the underlying factual findings, remand to reconsider Dr. Kukreja-Barua's opinions is unwarranted.

## VI.   Recommendations

The ALJ applied the correct legal standards and substantial evidence supports his decision. The undersigned recommends:

(1)   **affirming** the Commissioner's decision;

(2)   **directing** the Clerk of Court to enter judgment for the Commissioner of Social Security and against James Steven Rawls, Jr., affirming the Commissioner's decision under sentence four of 42 U.S.C. § 405(g); and

(3)   **directing** the Clerk of Court to close the file.[23]

**Entered** in Jacksonville, Florida, on February 6, 2019.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   Counsel of Record

---

[23]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.